Thank you, Your Honor. Good morning. May it please the Court, I'd like to reserve five minutes of my time for rebuttal. In many cheap pulp novels that they start, it was a dark and stormy night. Well, this was a dark and stormy night on the Blackfeet Indian Reservation in northern Montana on the early morning of December 9, 2005. Probably cold, too. It was very cold. That, I will concede, it was undisputed. The video showed the blowing snow. I'm from Hawaii. We're talking hostile environment here. Actually, the hostile environment I'll get to a little bit on my restitution issue. But, yeah, it snowed last month a lot, even down at Great Falls. The first issue I'd like to address is the gunshots. And this is an abuse of discretion standard. This case was a car wreck. The assault was allegedly a pickup truck backing into the BIA Tahoe. And unlike the earlier cases here, BIA means Bureau of Indian Affairs. Mr. Juneau was charged with assault with a deadly weapon, and the weapon was the pickup truck, not a firearm. It's our position that Judge Haddon's reliance on the Matthews case is misplaced. Matthews rejected, on the facts of Matthews, the transaction argument of the government, which, as I understand it is, to be able to tell a coherent and comprehensible story to the jury, they needed to explain why the officers cut off the pursuit. And that reason is the gunshot. Well, as we've just discussed, it was a miserable night. One police vehicle had already run out of gas. It was cold, windy, snowy conditions. They were literally in the middle of nowhere. And what footprints there were leaving the truck had been blown over by the snow. So the government didn't need the gunshot evidence to put forward a coherent, comprehensible story to the jury. I don't, neither was the gunshot. Let me ask you again. Was the gunshot evidence particularly prejudicial? I mean, the issue, in the end, appeared to have to do with identification. And the fact that there are gunshots doesn't speak to whether it was your guy or not at all. So what's the impact of the gunshot evidence? I believe it took what, in our opinion, was essentially a car accident and now made it into a much more nefarious course of conduct in that. Well, I'll let you speak to that, but I'll also add something else. That suggests maybe it wasn't just a car accident, because a car accident wouldn't usually produce gunshots. So maybe it was relevant to disputing the question of whether it was a car accident case. Well, Your Honor, you spoke to the identification. I think all the officers testified they thought there was someone else in the vehicle. So I think that's where it may become prejudicial, too. I think I wouldn't have ground to stand on if the officer's testimony was, it was Mr. Juneau shooting at me. But that wasn't the testimony because they didn't see it, and they all said there was somebody else in the truck. So that's how I think it. So how does it prejudice Mr. Juneau? If anything, that opens the door to the fact, well, there may have been gunshots, but that doesn't mean it was Juneau doing it. That doesn't mean he's a real bad guy. And it doesn't speak at all to the question, which I understand was the basis of defense, that Juneau was saying it wasn't me. Well, if it wasn't him, then what do the gunshots have to do with anything? I guess I agree. What do the gunshots have to do with anything? So how do they hurt? I'm sorry? So how do they hurt? I mean, my first question, I admit I knocked you off base, so I'll come back. Okay, the gunshots come in. What's prejudicial about the gunshots? That it's a more serious type of assault than, well, I'll term it anyway, a fender bender. And I think that has the potential to paint Mr. Juneau as a much worse person than otherwise what he's charged with. If it was Mr. Juneau. Right. But, I mean, this isn't like evidence to design to paint the defendant as a bad guy, because the whole question is whether it was defendant in the first place. He's not getting convicted for anything more serious than he's charged with. So, I mean, I suppose all things being equal, you just assume not have a gunshot enter the case. But it's hard for me to figure out how it could have impacted upon anything here. And then your comment about how this is a car crash case, was this just a car accident, leads to the second question I had, which is does that, in fact, offer the justification? Because if it's just a car accident, you don't really expect the gunshots afterwards. Because there were gunshots, can you work backwards from that to say, well, you know, the guy was doing something more than just getting into a car accident here. So maybe that provides the relevance to that testimony. I think maybe if the gunshots were first, it might. But given that they were after, and, again, that he wasn't charged with that, I think it puts something before the jury that, on balance, is not part of the transaction and wasn't needed by the government. And, obviously, it's a very serious shooting of police officers. So as I think you kind of phrased it, yeah, all things being equal, we would prefer that it not have been in. And I think, obviously, we can't go in the jury's mind, but I don't think it was helpful to them necessarily in deciding the case. Well, in fact, the government didn't even refer to the gunshots in its closing argument, did it? I don't recall, except your representation. I know the testimony came in. I cannot tell you that I do recall the gunshots being in there, so they probably weren't. Wasn't your defense that it wasn't him, and even if it was, it wasn't that big a deal? Our defense was that it wasn't him. I don't think we even, at least to the jury, necessarily concentrated on that it wasn't that big a deal. Well, then if it wasn't him, that was the only defense you had, right? Yes, Your Honor. Okay. Thank you. Judge Clifton stole my questions then, if that's your only defense. And if I may follow up, then it became a jury credibility issue because your client's witnesses were the ones that testified that he was with them, correct? Correct. And that's, I have that a little later on. All right. Now, the next issue is the potential jury misconduct. Yesterday, Mr. Thager and I were having coffee discussing the case, and he somewhat just dared me to open my remarks to you all with saying, this is the case about the drunk Hooterite. You sure it was coffee you were having yesterday morning? Maybe you blew one down at 6 a.m. too. No, I didn't. Mr. Thager did that. Who's to say? That was after he argued before Your Honor. He may have needed one after dealing with the Ninth Circuit. Who knows? But I think saying that he was the drug Hooterite would be unfair because we don't know. And that's the problem. Was he intoxicated? Was he buzzed? Was he neither? Somewhere in between. Had he had that start of the day or was that his nightcap? The district court asked him in front of his fellow jurors, which I attempted at least to express my concerns with that to Judge Hatton, that having him in front of the others I didn't think was the best course of conduct. But this is an abusive discretion review. All three of us, Mr. Thager, myself, and the judge indicated we'd never seen this. And so, quite frankly, we're here asking, at least I'm here asking, to offer some sort of guidance. Well, I have to admit to have a juror tell you that he'd had gin at 6 a.m. if he had any sense, and, well, I've been here. The explanation isn't that he wouldn't have otherwise, but he couldn't because he was in the courthouse. At least we know the courthouse is dry, if nothing else. It is an unusual situation. So what is the district court supposed to do? Well, one ---- You didn't object, right? No, I didn't. But I will point out that in our excerpts on 2 page 70, the district court stated to us, if either counsel wishes to place something of record to the contrary, you're certainly welcome to it. However, the court's made its decision. So, no, after that admonition, I did not formulate in all candor that I could have thought of anything. And to be candid, you laid it out for us properly. It's a weird situation. The court basically says, I don't know of anything else. How do I better more directly address this? And both of you comment and acknowledge that this is a little strange, and, gee, we don't know what else to do, and go on. The problem is that, okay, here we are sometime later, and I don't know that I have a better suggestion either. It's difficult to fault the district court in circumstances where it plainly says, ask, what do I do? And neither of you can come up with any particular good suggestions, so life goes on, the trial goes on. At this point, it's hard to characterize that as being plain error. Well, I did indicate that I didn't think it would be probable to question him in front of the other jurors, so my suggestion would be to have him by himself, because apparently there's already some animus, or at least the suggestion of some animus, that the foreperson, and the foreperson's note says some of our members, it's not just the foreperson, but apparently some other members of the jury also have had concerns about this man's sobriety. And there is the jury. Well, to be fair, Judge Haddon said I made my decision, and Judge Haddon is not a shrinking violent. He makes a decision. You go on and live with it. And I take that to be the position you took. But I think from a practical perspective, I do have a hard time figuring out, without a specific plan of action being offered up in front of him, I don't know that I can describe it as erroneous on his part to shrug his shoulders and say, well, that's the best we've got for now, and go on. And maybe it would be nice to have a procedure in place for situations when they come up, but you hope you don't encounter this particular situation often enough that it needs to be in the bench book. Beth, I guess your suggestion is the juror would have been more forthright had he been canvassed individually. Correct. But at the same time, the judge had had the opportunity to observe that juror, and at least there was no indication to the attorneys or anyone else in open court that he was drunk. Correct. But I think the possibility does exist, as you stated, Your Honor, that he may have been more forthright, and maybe the answer would have been more than one glass. We don't know. But he may have been more candid had he not been answering the questions in front of his fellow jurors. What prejudice is shown here? We don't know. The uncertainty is the prejudice that we may, may not, we don't know, we may have had someone who was not at their complete faculties, and it's the Jordan versus Massachusetts, the 1912 Supreme Court case we cite, but due process implies an impartial and mentally competent tribunal to hear the matter, and we're just not sure. We don't know. We're not sure whether or not that is what took place here. Again, it is a very interesting, unusual issue, and quite frankly we're, I'm at least just seeking some guidance that should it come up again, we would have perhaps something from this court to tell us how better to proceed or perhaps say that this was fine. Back to the Judge Sandoval's earlier question on the insufficient evidence or the conflicting testimony. It's a de novo review. The officer, Officer Salloway, at the time on the tape says, well, it looked like him, and that's it. But he knew him, didn't he? He'd known him before. Yes. He said he'd known him for about ten years. They grew up together. But he said it looked like him. To me, if you've known somebody for that period of time, it is. Yeah. Hey, Mike Juneau's driving. Now did it look like Mike Juneau? And I believe he made that identification after running the plates and learning it was his aunt's truck. So you wouldn't be, I suppose it looked like him. When you already know it was a family member's truck, I would expect anyway a more firm declaration of identification. And I didn't look.  Was it did it look like him? Yes, it looked like him. No, he's on the video of the chase. And after the wreck, the truck backs into the officer's vehicle, the officer gets out of his truck and other officers come toward him, and he says, I believe one of the officers says, who was it, or was it Juneau? And he said it looked like Mike Juneau. So it wasn't, I'm not saying the trial questioning, but the video of the scene. You know, right then the contemporaneous declaration is it looked like him. Well, isn't that a weight issue? Yes. It is. And don't we look at this in the light favorable to the prosecution? Any rational trier of fact could have found the essential elements of the crime? Yeah, you look at it in the light most favorable to the jury's verdict, which in this case was the prosecution's argument. Well, I have to go with the prosecution because they won this one. Yes. Well, that was my point of not saying it's always the prosecution. I understand. If you'd have won, then. Well, we wouldn't be here. If you win a verdict, we wouldn't be here. I was going to say, if you'd have won, we wouldn't be here. And you all wouldn't have heard this fascinating story of the genet. And we would have been the poorer for it, too. Excuse me? We would have been the poorer for it if we missed out on that story. And then the next issue we raised was sentencing. And it certainly seems from the sentencing transcript that Mr. Juneau was sentenced in part because he asserted his right to a trial. The district judge made a point of pointing out to Mr. Juneau that he had shown no remorse. Well, this is a man who stood on his rights to proceed with the trial, went to trial, was convicted, but that shouldn't – I don't think that's applies under either of the guidelines, or certainly it's not a 3553A factor, lack of remorse. A five-year sentence, in our opinion, for this conduct is simply unreasonable, and reasonableness is the standard. I don't believe the sentence of this length promotes respect for the law. It may provide deterrence. I don't think Mr. Juneau was necessarily a threat to the public, so the public hasn't – or the protection of the public, which is the third factor in the 3553, isn't necessarily implicated by such a severe sentence. The letters from the community, even from the chief of the tribe, which I stated to Judge Hannon, that sentencing is an unusual thing. It is not a run-of-the-mill, here's the letter from the chief on every case from the Blackfeet Reservation. It's a rare thing. And if you have – and we get a lot of these, unfortunately, from all the reservations, but this one, an involuntary manslaughter because someone's intoxicated and driving generally gets you about 36 months. So an accident where luckily the officer wasn't even injured to get you two years more, we would submit is not reasonable. But you agree the calculation of the guidelines was correct, correct? Yes. And so we're only dealing with 3553 errors? Correct. And so you also admit the court articulated each of the sentencing factors? Yes, I believe he articulated them. And so, therefore, what you're suggesting is after suggesting all of the factors and suggesting he's gone through the factors, then the way he said what he said was not the way he should have said it? No, I'm saying the way. You're saying bordered on negligence. Your argument is this bordered on negligence. I know that's your argument, but one could equally make an argument that it wasn't negligence at all, somebody trying to run over the officer. You suggest that letters are good, but the judge was focusing on what he had done, how he had done it. I guess I'm trying to figure out, given my standard of review, how I really can help you. Well, I think he articulated the fact that I think they were misapplied or not given the proper weight and certainly the factor of promote equality of sentences given that generally what I would consider at least a much more serious crime generally under the properly articulated guidelines gets you a lesser sentence. And we objected in our... An innocent officer is not a very tough crime in Montana? Well, in this case, the officer wasn't injured as opposed to an infanticide manslaughter where you've got someone, officer or not, who's deceased. I would say on that scale I'm not minimizing an assault on an officer, although I do think that the properly calculated guideline is greater than the 3553 because you get the double counting. Lastly, on the restitution issue, and this goes back to how rough things are up there, there was no evidence of the condition of this vehicle at any time before this accident. And the officer, there was nothing from him that he... He was a police officer. He wasn't the police mechanic, and all of a sudden he shows up or we get it sentencing without him there to cross-examine and get this bill. I think that denied us the opportunity. Well, obviously it denied us the opportunity to challenge that issue, and for all these reasons, and I'll have maybe a minute left, we would ask the court to reverse the case. Thank you. Thank you. Good morning. I'm Joe Thagard. I'm the assistant United States attorney from Helena, and I tried this matter with Mr. Brown. Turning to the issue of the shots fired, the reason that these officers cut off the pursuit was not due to the poor conditions. They had pursued this vehicle across, I think, about 17 miles of bad roads under snowy conditions, were continuing the pursuit. The reason they cut off the pursuit was because of the gunfire. That was the truthful, factual explanation for what they had done, and the trial court wasn't required to sanitize that. I would also note that, at least from the government's perspective, there was no prejudice. We didn't even argue to the jury that the defendant was the person who fired those shots. Turning to the issue of the juror, it was an anomalous situation, and while I can understand, on one level, Mr. Brown, on the suggestion that we should have some sort of guidelines for how to deal with this sort of situation, I don't know that we can craft guidelines to deal with everything that happens in a courtroom. That's why courts are vested with discretion. In this particular instance, Judge Haddon consulted with counsel. He asked us what to do, and ultimately he talked with his juror. He asked him if he'd been drinking, how much, when he last had alcohol, and if he was under the influence. And after that colloquy, there was no further suggestion from counsel that anything else should be done. And that's an appropriate use of discretion. And moreover, in this particular case, there was no complaint. I mean, not only did counsel not object, they actually acquiesced in this. And we didn't have anything particularly constructive to add to the mode of interrogation that he undertook. And I think that there's certainly no plain error and there's no abuse of discretion. Do you agree that it might have been a better method to have asked him, that juror, those questions individually outside the presence of the other jurors? You know, I think that it may have been, Judge. And in fact, I believe that initially I suggested that what we should do is we should take the foreperson in a private setting and speak to that person and then speak to this juror as well. And frankly, my concern was more for getting the perspective of the foreperson in a private setting than the particular juror. As it was asked, however, I think that the court was still in a position ultimately to view this man and to make some assessments about whether he was under the influence or not. So, sure, I suppose hindsight is always 20-20, but I don't think it amounts to plain error in this case. But in your observance of this juror, you never saw him nodding off or doing anything to indicate that he wasn't in tune with what was happening at the trial? No, I did not observe. And I'm certainly capable of putting jurors to sleep and have done that in the past and don't observe that I did it in this case. And so I certainly didn't see anything of that nature. If I had, I would have called it to the court's attention. With respect to the sufficiency of the evidence, Officer Salway at the scene did say something when he was calling it to 911 to the extent that I think it was Mike Juno. At trial, however, he stated very clearly that it was Juno. This is a credibility issue. The jury weighed it. And finally, with respect to sentencing, I think that the court's statements at sentencing were very comprehensive. It's clear that the court considered these 3553A factors. It considered these letters that were submitted from the community, but simply found that essentially it was going to place a different weight on those than suggested by the defense. Unless the panel has questions for me, I'll go ahead and sit down. It looks like we're letting you go. Thank you. Mr. Branham? Thank you, Your Honor. Briefly, and I don't remember which one of the panel asked if myself or Mr. Thayer or the judge saw anything, any effects of this juror, and I answered the question that we didn't, but apparently the jury did. And not just the foreperson, but by the verbiage in the note, more than one did. And so that's what, you know, something more could have at least been done to inquire. And as Mr. Thayer pointed out, he suggested that the court talk to the foreperson. I didn't disagree or object to that suggestion, and so maybe, yes, we should have. Let me just ask you about that. Now, unlike my colleagues, I've never been a trial judge. I've been a trial lawyer, but I never served as a trial judge. So I know from talking to friends who are trial judges that there are at least some judges who are reluctant to separate jurors or to talk to them individually for fear of causing the other jurors to wonder what's going on and are they talking about me and so forth. So I think it is a little bit of an awkward situation. If we had some better guidance as to how to deal with it, it might make life easier for everybody. So do you have any concern about, I mean, is there a disadvantage to separating out a juror and talking to them separately? This is my time, not yours. You still get your 30 seconds after this. There very well could be. I think the suggestion of the foreperson, they've already elected the foreperson, presumably, although that would be an area of inquiry, the jury knew, or at least some of the jurors knew the foreperson was sending this note. So I don't think, at least in the instance of this case, talking to the foreperson on this topic. But I do agree, quite frankly, it's a double-edged sword. Are you picking one out? On the other hand, are they going to be influenced when you're questioning the particular juror about his imbibing in front of the entire panel in court? That was my curiosity. You've still got about 30 seconds. Again, I think when you've raised all these issues, and maybe not one straw breaks the camel's back, but when you get them all together, it's our submission to the court that this requires Mr. Gino's conviction to be reversed and the case be remanded to the District of Montana. Thank you all very much. Thank you. Thank both of you. The case just argued is submitted.
judges: Clifton, Smith, Sandoval